UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN G. FRASER,

               Plaintiff,                         Case No. 05-60164

vs.

                                       HONORABLE JOHN CORBETT O'MEARA
                                       HONORABLE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____/

## REPORT AND RECOMMENDATION

Brian G. Fraser brought this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) in order to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED IN PART and the record be REMANDED FOR RECONSIDERATION.

## I.    PROCEDURAL HISTORY

Plaintiff applied for DIB on August 2, 2002, alleging he was disabled as of March 9, 1996. (R. 15, 45 - 47). On January 23, 2003, Plaintiff's application was initially denied. (R. 35). Plaintiff protectively filed an application for SSI on June 23, 2003.[1] (R. 15, 382 - 383). A

_____

[1] The initial denial of SSI benefits to Plaintiff is not included in the record.

1

hearing was held before Administrative Law Judge ("ALJ") Anthony B Roshak on August 5, 2004. ALJ Roshak issued a decision on February 14, 2005, finding Plaintiff not to be entitled to a period of disability, for either DIB or SSI. (R. 15, 25). In a letter to the Appeals Council, Plaintiff amended his onset date of disability to December 19, 2001, one year prior to a psychiatric examination on December 19, 2002.[2] (R. 387). On June 13, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. 6 - 8). In this action, Plaintiff seeks benefits from the amended onset date of December 19, 2001.

## II.   PLAINTIFF'S HEARING TESTIMONY

Plaintiff testified before ALJ Roshak on August 5, 2004. He was represented by his current counsel. He lives by himself in a mobile home and been married twice, divorced from his first wife and widowed from his second. (R. 395, 393). He has three children who live with his first wife, the youngest 14 years old. His date of birth is June 2, 1956, and was 48 years old at the time of the hearing. Plaintiff graduated from high school, with one year of mechanical training from Michigan Career Institute in 1978. (R. 394). He receives food stamps and medical insurance from the state, and his mother helps him with his rent and bills.

Plaintiff is not currently working, and has not for at least the past "three, three and a half years." (R. 395). He worked as a mechanic for 18 - 19 years; he was a licenced master mechanic, but his license lapsed "way past five years ago."[3] (R. 394, 407). He had a Worker's

---

[2] The Plaintiff requested a "December 2001" amended onset date, "one year prior" to a psychiatric examination on December 19, 2002. (R. 387, *see* R. 295 - 298). December 19, 2001 is one year prior to that examination and is supplied here as the specific, amended onset date.

[3] Vocational Expert Elizabeth Posikowski testified that he had also worked as a cashier, janitor, grinder (doing some machine operation at that job as well), manager at a muffler shop, and a shipping clerk. (R. 407 - 409).

Compensation case that settled for $50,000 in May of 1997.  (R. 395).

In response to questions from his attorney, Plaintiff testified that he was not currently working because of his depression, which causes him to not leave his house for days at a time.[4] (R. 395).  Plaintiff testified that the occurrence of episodes varies from every three months to twice a month, and he has had them for five or six years.  (R. 396, 397).  The latest was three weeks before the date of the hearing, where he locked himself in his house for seven days, not going out to get anything to eat and staying in bed.  (R. 396).  His mother came by and found the doors locked, but he shouted through the door he was okay and that he wanted to be alone.  (R. 396 - 397).  His depression has worsened since his second wife passed away, dying in his arms. (R. 392).  He feels empty and alone, and has been undergoing grief therapy for three years. He talks to his late wife "every day."  (R. 402 - 403).

On a day-to-day basis, his depression strongly affects his desire to socialize with others.[5] (R. 400).  On a "Self-rated Global Assessment Scale" ("SGAS") form sent to him by the Court, Plaintiff rated himself a "28," because he stays in bed all day, and has daily thoughts about suicide.[6]  (R. 400 - 401).  He states that he battles this by thinking about the promise he made to his oldest daughter not to hurt himself after his second wife died.  (R. 401).  In response to a

---

[4] ". . . with the depression some days I just lock myself in the house. I don't answer the phone. It's just impossible to find work that will accept that."  (R. 395).

[5] "I'll go out and that but I don't – I try not to socialize with people. If I go I'll usually wait until evening so I don't have to bump into the neighbors and have a chitchat with them. You know, I'll walk down to the mailbox or take my dog for a walk but I'll wait until dark to do that when everybody's in their house or in bed. I just – I don't know. I'm just kind of a loner I guess." (R. 400).

[6] *See* R. 99 for SGAS scale categories. The criterion for self-scores between 21-30 on the Scale reads "I cannot carry out my daily activities due to my problems" and has examples like "seeing or hearing things that no one else sees or hears, constant thinking about suicide or staying in bed all day." (R. 99, 400).

question by ALJ Roshak as to why Plaintiff did not rate himself between 41 and 50,[7] Plaintiff

responded that during his major depressions he doesn't "have . . . what it takes" to do

housework, such as his dishes, "washing the floor," or a bathroom needing painting he hasn't

been able to paint for over two years.  (R. 401 - 402).

Plaintiff testified that he can sit 30-45 minutes before he has to move, and is able to stand

for 10 minutes at a time.  (R. 403).  He can only walk about a quarter mile, lift 15 pounds, and

carry 5; he can carry less weight because it puts a strain on his back.  (R. 404).  He does not

drive, does not own a car, but uses public transportation.

Plaintiff testified that he used to drink heavily "to medicate [his depression], to sedate

myself I guess."  (R. 397).  Currently he is under treatment for his depression.  He had been

treated with Prozac, but his current therapist, Dr. N. B. Murthi at First Resources North switched

him to "other medications for the bipolar."[8]  (R. 398).  He has been seeing Dr. Murthi for a year

and a half.  (Id.; R. 308 - 340).  He also sees a therapist, Pam Trulic, there once a week; he has

seen a therapist there for a year and a half, recently switching to Ms. Trulic from Ginger Mason.

(R. 398 - 399).  He is currently taking Zyprexa, Lexapro and Antabuse, and listed several other

medications in a list provided to the court.  (R. 399).  He also takes Motrin, 800 mg, "on days

when [his] arthritis is really kicking in."   He takes the Antabuse daily.   Plaintiff testified that he

had been taking his second wife's Antabuse after she died, but now had a prescription of his

_____

[7] The defintion of 41-50 for the SGAS scale reads: "I am able to take care of myself but my problems have greatly affected my life," having examples like "no friends, suicidal thoughts, inability to keep a job, trouble with the law or frequent panic attacks."  (R. 99, 400)

[8] "Yeah. I was treated for years with Prozac and they had me diagnosed as major depression. Then the psychiatrist that I have now says that that was absolutely wrong and I shouldn't have been taking Prozac, I should be taking other medications for the bipolar."  (R. 398).

own.  (R. 392).

Plaintiff currently sees Dr. Murthi and has not been recently hospitalized, excepting some medical tests such as CAT scans and upper GI that were done in hospitals.  (R. 405).  He checked himself into Harbor Light, a detox center on May 26, 2004, spending 5 days there.  He had bought a half-gallon of vodka and "knew I had to quit and I knew I couldn't do it on my own so I checked myself into a detox program."  (R. 406).  He had also gone to Harbor Light on September 29, 2003, while "drunk" and admitted on that occasion to drinking one-and-a-half gallons of vodka over a "two, two and a half" day period.

Plaintiff's attorney discussed the initial alleged onset date[9] with ALJ Roshak in response to a question about the "ramifications of the DNA statute." Counsel noted that the onset date was "very unusual" and acknowledged that substance abuse was material to the disability until at least June 2000, or possibly even December 14, 2001, when he had stopped drinking for 3-4 months.  (R. 390 - 391).  Plaintiff's attorney argued that the "five or six" "relapses" after that date that were only "episodic" in nature.

**III.    MEDICAL EVIDENCE**

**A.    SUMMARY OF EVIDENCE PRIOR THE DECEMBER 2001 AMENDED ONSET DATE**

Included in the record is substantial medical evidence from prior to the December 19, 2001 amended onset date, as such, it will be listed here in a summary fashion, given in more detail where it impacts the medical history of the Plaintiff after the amended onset date.  Also, because Plaintiff is not challenging the exertional portions of his decision, but only that his disability is caused by his drinking, and not his psychological impairment, much of the evidence

_____

[9] - March 3, 1996.

5

of physical treatments is omitted.

In a May 2000 Client Assessment for a Detoxification Program at the Harbor Light Center, Plaintiff admitted drinking since he was 12 years old, frequently drinking a fifth of alcohol a day.  (R. 231).  Plaintiff entered into several treatment programs for alcohol dependence prior to his suicide attempt in September 1995.  (R. 231, 123 - 124, 121).

On September 14, 1995, Plaintiff was admitted into Detroit Receiving Hospital after attempting suicide by jumping off the Belle Isle Bridge the night before.  (R. 127).  The nurse who filled out an emergency psychiatic nursing triage assessment of the Plaintiff noted that he stated "I want to die" and complained of alcohol abuse.  (R. 129).  Plaintiff stated that he had a history of suicide attempts, current suicidal ideations, and a past psychiatric history.  (R. 130). He seemed "agitated," but "rational," with a "demanding" attitude, a "depressed" mood and "potential for self-harm."   The attending physician, Philip A Lewalski, M.D., diagnosed him with recurrent depression.  (R. 127, 136).

In a psychiatric evaluation by Dr. S. Golec at Detroit Receiving on the same day, Plaintiff's affect was "flat", seemed "depressed" and was preoccupied with his problems, e.g., his "pending[?] divorce", but the rest of his outward psychological indicators, such as hygiene, grooming and cognitive functioning, seemed otherwise normal.  (R. 132 - 133).  Dr. Golec noted that he had spoken with the Plaintiff's mother,

> who stated the pt. [patient] has been depressed for [about] five years. The pt. has also been in substance abuse X3 [three times]. The pt. has been clean [around] six months. . . [T]he pt. was taking Prozac. At the present time, the pt. is not taking any medication. The pt. states he is depressive due to the divorce [from his first wife]."

(R. 133).

6

On July 8, 1996, because of his intoxication, Plaintiff was brought into the St. Johns Hospital Emergency Room by the police and remained overnight. (R. 138, 140). On approximately March 9, 1996, Plaintiff suffered a disc prolapse, and claimed a period of disability (under Worker's Compensation) beginning on May 30, 1996, the date of an examination by S. Vunnam, M.D. (R. 196).

On December 4, 1996, Plaintiff was admitted to the burn unit at Detroit Receiving, after being transferred from St. John Hospital, following a house fire. (R. 149, 155, 173 - 175). Plaintiff had to jumped out of a second-story window to escape the fire; it was not a suicide attempt. (R. 163). He suffered burns to 20% of his body, including third degree burns on the dorsum of his hands and forearms, and blunt abdominal trauma. (R. 155). In a surgery on December 7, 1996, by Drs. Chenicheri Balakrishnan, M.D. and Michael Herzog, M.D., Plaintiff underwent a skin graft procedure for his third-degree burns. (R. 155, 157).

On December 5, 1996, Plaintiff underwent a psychiatric examination, the consultation authorized because of the Plaintiff's history of suicide. (R. 163). The examining physician listed Plaintiff's history as including chronic back pain, alcohol abuse including blackouts and "DT's", with a history of, but no current use of crack and marijuana. (Id.; *see also* R. 172). Plaintiff stated that he had been diagnosed with "major depression recurrent" and that he had not seen a psychiatrist for six months and was taking Prozac and another drug. He admitted to a history of depression and sleep problems, but denied any current "suicidal/homicidal ideation." (R. 164). The physician's impressions were: (1) a history of major depression, (2) alcohol abuse/dependance with the possible beginnings of alcohol withdrawal.

On August 31, 1998, Plaintiff was admitted to St. Joseph's Mercy of Macomb Hospital

7

with a comminuted left proximal tibia fracture, contusion of the elbows and laceration of the face; he was examined by Richard T. Perry, M.D. (R. 199). Plaintiff stated that he had been assaulted while riding his bike, jumped a fence and subsequently fell. (R. 199, 201, 205). The fracture was treated by the insertion of two screws in a surgery on September 1, 1998. (R. 202). Plaintiff began physical therapy on November 24, 1998, and was able to walk six miles, with the aid of knee brace, by August 3, 1999. (R. 208, 210).

Plaintiff was hospitalized for intoxication on January 5 and 6, 2000, with an admission blood alcohol level of .23 g/dL. (R. 220 - 227). On May 22, 2000, Plaintiff was admitted to the Harbor Light Center, for alcohol detoxification. (R. 228). Plaintiff was "crying" at admission and his blood alcohol level was .343; he had a "flushed face" and "unkept appearance." (R. 228, 231). Plaintiff was admitted again on June 19, 2000, to Harbor Light, with a alcohol level of .153. (R. 242).

Plaintiff's second wife died on June 13, 2001. (R. 281). On August 15, 2001, Plaintiff saw Dr. Payton for a followup for depressive symptoms. (R. 271). Plaintiff was currently taking Vistaril for his sinusitis; Dr. Payton prescribed Prozac and Desyrel for Plaintiff's depression.

### B.    EVIDENCE AFTER THE DECEMBER 2001 AMENDED ONSET DATE

On December 12, 2001, Plaintiff was administered a variety of intellectual and academic tests by James M. Briesmeister, Ph.D, an examiner for the Michigan Department of Career Development / Michigan Rehabilitation Services, to "be used in the formation of vocational rehabilitation plans." (R. 280). Dr. Briesmeister reported that the Plaintiff stated he would like to work as a radiologist or "with computers," noting that he could not "stand for long" with his knee problem. (R. 281).

8

Upon testing, Plaintiff was found to have an average score on the Weshsler Adult Intelligence Scale. (R. 282). His visual acuity was low average, however, and his spatial skill borderline, "work[ing] slowly and somewhat inaccurately with his hands." (Id.) Dr. Briesmeister theorized that "this could be due to the stressors of his circumstances as well as the fact that he is experiencing depressive affect which can negatively impact upon motor performance," but Briesmeister also reported that Plaintiff had told him he had sprained his hand "about three weeks prior to the testing date." (R. 284). Plaintiff's reading and word pronunciation was in the average range at a 11.4 grade equivalency; his spelling achievement test was in the 8th percentile at a 5.4 grade equivalency, "indications of a learning disorder in spelling and written expression." (R. 282 - 283). His mathematic testing was at a 7.2 grade equivalency, in the low average range, which was "weak" but not an "indication[] of any learning deficit[]" and Plaintiff was "able to grasp routine and everyday business math." (R. 283). Dr. Briesmeister concluded Plaintiff had "significantly stronger" verbal than math learning potentials.

In his evaluation of psychological and adaptive functioning, Dr. Briesmeister found Plaintiff to be "experiencing rather high levels of stress, tension, and anxiety," caused by thinking about his health and ability to remain sober.[10] (R. 283). He found "strong indications of depression" as well as an "understandable grief reaction" to the recent death of his wife. Despite the current stressors, Dr. Briesmeister found Plaintiff was chronically depressed.[11] Dr.

---

[10] Plaintiff stated to Dr. Briesmeister that he had been "alcohol and drug-free for 3 - 4 months." (R. 284).

[11] "...test findings indicate that the depression is chronic. He has been depressed for a prolonged period of time. Furthermore, the mood disorder is persistent and pervasive. It negatively impacts upon his overall functioning and performance. The clinical results and test finding [sic] also suggest the

9

Briesmeister wrote that "it was possible that [Plaintiff] used drugs in a futile attempt to mask/deny depressive affect", but it was "also likely the drugs and the problems associated with them intensified the depressive affect." (R. 284). He diagnosed that the Plaintiff had polysubstance dependance, major depressive disorder, recurrent and moderate, and a disorder of spelling and written expression.

Dr. Briesmeister concluded that Plaintiff's prognosis depended on "continuation of a drug-free lifestyle," strongly recommending going to A.A or N.A. programs, and continuing in psychotherapy. (R. 285). He thought that training for a career in radiology might be "challenging," but that Plaintiff would otherwise be intellectually suited for a wide variety of jobs.

In response to a letter from the Michigan Department of Career Development / Michigan Rehabilitation Services, (R. 293), Plaintiff's physician, Dr. G. A. Payton, filled out an assessment of Plaintiff's general health, physical capacities and mental health on December 24, 2001. (R. 288 - 292). Dr. Payton last saw Plaintiff on December 21, 2001. (R. 288). Dr. Payton recommended that because of Plaintiff's "arthritis," "osteoarthritis," "clinical depression" and "multiple skin grafts, he should avoid lifting over 25 pounds or bending at work, and that he would never be able to squat, crawl or kneel, push or pull, or climb. (R. 292). He stated that the Plaintiff should avoid machinery with moving parts; unprotected heights; dust, fumes and gases; and marked temperature or humidity changes. He stated that the Plaintiff was physically able to enter training, not employment, on a part-time basis. (R. 290).

In terms of Plaintiff's mental health, Dr. Payton gave him a "guarded" prognosis, noting

_____

presence of low self esteem and a number of self-doubts." (R. 283).

10

that he was taking Prozac and Desanyl for his clinical depression, which were necessary for rehabilitation and employment.  (R. 289).  Dr. Payton, filling out the rest of the report on Plaintiff's general behavior, checked the boxes: "does not attend to tasks," "response to stress typically interferes with work performance," "exhibits low tolerance for rejection during job seeking," "unable to relate appropriately to supervisors and authority figures" and will have difficulty "performing tasks accurately that require speed," "functioning in a competitive work environment" and "maintaining punctuality and attendance."  (R. 288).

On August 2, 2002, Plaintiff interviewed with Claims Representative N. Kulpa, as part of his application for disability.  (R. 52 - 55).  Mr. Kulpa noted that "there was a clear alcohol odor around [Plaintiff] while he was here" and that Plaintiff told him "he last used alcohol last weekend."  (R. 54).

On December 19, 2002, James Wargel, Ph.D, LP, and Patricia Pearson, M.A., LLP, gave Plaintiff a psychological assessment for the Michigan Disability Determination Service. (R. 295).  Plaintiff reported using his deceased wife's Antabuse after a drinking relapse one and half months previously.  He stated he had not been working since December 1999 following the leg surgery.  (R. 295).  Plaintiff stated that he avoids going out with friends, since they are "involved with alcohol." He just stays home or goes to Alcoholics Anonymous when he can; his inability to sit or stand for any period of time has made him not participate in physical activities and he has picked up no new hobbies.  (R. 296).   Plaintiff stated he has "lousy" sleep on an erratic schedule because of pain and his worries, waking frequently with difficultly going back to sleep; he "will go to sleep for several days, and then not sleep at all for several days."  He stated his condition at his house has worsened since the death of his wife a year and half previous.  Dr.

Wargel and Pearson noted Plaintiff was on the verge of tears as he discussed his situation,

admitting to feelings of worthlessness, isolation, with little hope for his future.[12]   (R. 296, 297).

Dr. Wargel and Pearson concluded that the Plaintiff was:

in good contact with reality.  He's aware of the date, place and person.  He has suffered
a decline in self-esteem as he is unable to support himself.   He is emotionally
vulnerable with a history of undiagnosed, inconsistently treated depression, multiple
suicide attempts and poor self-esteem.  His substance abuse has resulted in many social
and vocational failures. His mood is subdued and he is coping with depression.  His
motor activity is subdued but he is pleasant.  He has poor insight into his emotional
responses to his situation. [Plaintiff's] report was spontaneous, logical and adequately
organized.  He has difficulty with both memory and concentration due to pain and
depression.

(R. 296)

On Axis I, Clinical Disorders,[13] Dr. Wargel and Ms. Pearson diagnosed Plaintiff with

"Major Depressive Disorder, recurrent, severe w/o psychotic features," "Pain Disorder, with

both physical and emotional components – moderate to severe" and "Alcohol Dependence, in

partial remission, on agonist therapy."[14]   (R. 298).   On Axis IV, Stressors in Patient's Life, Dr.

Wargel and Ms. Pearson  noted "difficulty in adjusting to unemployment.  Lowered self-esteem,

pain, social isolation."  Dr. Wargel and Ms. Pearson assigned a highest Global Assessment of

Functioning ("GAF") score of 45, and a current GAF of 45, citing Plaintiff's "avoiding others,

---

[12] "[Plaintiff] is anxious if he has any expectations to meet, 'if I have to be some place at a certain
time.  I avoid people, I don't want to get out of bed.  Most days I have the shades drawn.  I am just upset
with my depression and physical limitations.'"  (R. 297).

[13] This is one of the axes of the Five Axis system for standardizing the diagnosis of  mental health
disorders, from the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental
Disorders* (4th ed, 1994*).

[14] Dr. Wargel found no personality disorders (Axis II), and listed Plaintiff's previous medical
history (burns, tibial fracture, etc.) under Axis III (previous medical diagnoses).  (R. 298).

isolating, feelings of worthlessness, vague suicidal thought while on antidepressant therapy."[15] They also noted they thought Plaintiff would be able to manage his benefit funds.

On December 23, 2002, Plaintiff had a medical exam with L. Banerji, M.D., for the State of Michigan Disability Determination Service. (R. 300). He stated that could walk unaided for about one block, climb one flight of stairs, stand for 30 minutes, sit for 15 minutes with his left leg elevated, and lay on his back for about 10 hours. Dr. Banerji's "diagnoses and impressions" were hypertension,[16] osteoarthritis in the knee joint as well as functional orthopedic limitations,[17] depression (with "good" memory, "fair" grooming and hygiene, "responding well to the examining situation") and "chronic poly substance abuse." (R. 302 - 303).

On January 10, 2003, Thomas Tsai, M.D. reviewed Plaintiff's extant medical file and completed a Psychiatric Review Technique Form ("PRTF") for the State disability determination. (R. 103 - 114). Dr. Tsai noted Plaintiff had a depressive syndrome characterized by appetite disturbance with change in weight, sleep disturbance, decreased energy, difficulty

---

[15] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed, 1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

[16] Plaintiff had been diagnosed with high blood pressure five days previously.

[17] I.e., "restricted movement of the hip and knee joints," problems bending his left knee while walking, limitations in squatting, walking tiptoe, in tandem gait and on the heel. Plaintiff was able to rise after squatting, from the supine position and the examination table without problems. (R. 302).

concentrating or thinking, and thoughts of suicide. (R. 106).  He also listed "alcohol dependance in partial remission."  (R. 111).  Dr. Tsai did not find any functional limitation or the "B" criterion that met the functional limitations needed to meet the Listing of Impairments.  (R. 113). Elaborating his findings, he concluded that the Plaintiff's "ability to maintain attention and concentration," "work in coordination with others" and "complete a normal workday and workweek" is "moderately impaired due to depression secondary to physical condition."  (R. 119).  Dr. Tsai further found Plaintiff's "ability to perform activities within a schedule is moderately impaired due to depression," concluding that Plaintiff "could do unskilled work."

On March 18, 2003, Plaintiff sought treatment for his depression from Macomb County Community Health ("MCCMH").  (R. 343).  He was seen by Virginia Rae Mason, RN, whose May 24, 2003 report was reviewed and signed by both a supervisor and a psychiatrist/psychologist.  (R. 343).  The clinician noted that Plaintiff "was tired of feeling this way and wants to get better and feel normal."  He complained of feeling depressed and "wishing he was dead," feeling "anxious, frustrated and angry," with difficulty sleeping and loss of appetite.  He reported going off Antabuse one month previously because of elevated liver enzyme levels, but he had not had any significant drinking in the past three months (although admitting he had one-half pint of Vodka while on Antabuse and became sick), with his last drink three weeks ago.  Plaintiff reported that his depression had been "increasing over the past years and especially the past few months."  His erratic sleeping schedule was continuing.

Plaintiff was diagnosed with (Axis I) Major Depressive Disorder, Recurrent; Alcohol Dependence in partial remission; and Bi-Polar Disorder, most recent episode Depressed Deferred.  (R. 342).  His Axis IV Stressors included his social environment, health care access,

14

and economic and legal stressors.  His GAF was 40.  There was a "moderate risk" of harm to himself because Plaintiff had stated he had promised his children he wouldn't kill himself.  (R. 346).  His functional status was moderate, because of his medical problems; his co-morbidity problems were significant.  His recovery environment was extremely stressful, because of his depression and worries about unemployment and money, but also supportive because of his mother's financial and emotional support.  Plaintiff had a poor history of response to his problems, and a moderate attitude and engagement.  He was prescribed medicines and monitored for his bi-polar disorder, assisted in finding an orthopaedic surgeon for an MRI and to treat his back, knee, neck and leg pain.  (R. 339, 334).  Plaintiff was referred to AA and SAMI (Substance Abusing Mentally Ill) meetings.  (R. 341, 334).

Of the ten SAMI group sessions, Plaintiff missed those on March 20, 27, and April 3, 2003, at least in part because of alleged transportation issues.  (R. 340, 338, 336).  On May 22, 2003, Plaintiff was given an initial psychiatric evaluation by N. B. Murthi, M.D., as part of the MCCMH program.  (R. 329 - 331).  Dr. Murthi described Plaintiff's current symptoms as including "mood swings."   Plaintiff seemed "older than stated age," "appropriately dressed and groomed," with "speech relevant and directed" and having a "mood depressed and labile, affect appropriate."  (R. 330).  Plaintiff "feels paranoid, denies hallucinations, has suicidal thoughts but no plans."   Dr. Murthi diagnosed Plaintiff with (Axis I) Bipolar Disorder II  – Depressed Type, Alcohol dependency; stressors (Axis IV) being "problems [including] primary support, occupation, financial"; and a GAF current/highest of 40/40.  (R. 331).  Dr. Murthi prescribed Zyprexa, a bipolar medication,  "to address largest symptoms," and referred Plaintiff to a SAMI program.

15

On June 18, 2003, Plaintiff had a medication review regarding the Zyprexa with Dr. Murthi; Plaintiff reported a "significant improvement in larger symptoms." (R. 328). At the visit, plaintiff's hygiene was "good," his mood "stable," and Dr. Murthi noted that the Plaintiff reported "no mood swings, [or] temper outbursts. Sleep improved. [Medically] compliant. Maintaining sobriety." Plaintiff attended SAMI group on June 19, 2003. (R. 326). On June 26, 2003, Plaintiff's Service Progress notes show that Plaintiff, calling to cancel a SAMI group meeting because he reinjured his knee and could not ride his bike to the session, reported "I'm doing much better on []Zyprexa. I'm not feeling as angry." (R. 327). Plaintiff missed SAMI group sessions on July 10, 17, and 31, 2003. (R. 324, 323, 321). Plaintiff called to inform MCCMH of his back and knee injury on July 28, 2003. (R. 322).

On July 30, 2003, Plaintiff received x-rays on his left knee from Michael Wind, D.O., which showed severe posttraumatic osteoarthritis.[18] (R. 360). Dr. Wind noted that the Plaintiff wore a knee brace "because it makes him feel stronger," that he had full flexion in the knee but a "5 degree extension lag," and 5 out 5 muscle strength. (R. 359). Dr. Wood advised a conservative treatment because of Plaintiff's age, waiting for a total knee arthroplasty "as long as the patient can tolerate."

Dr. Murthi met with Plaintiff on August 13, 2003 for a medication review. (R. 320). Plaintiff reported he went off his medications for a week "and felt crazy"; he was currently on them, however, and "maintained sobriety." On September 16, 2003, Plaintiff said "I'm doing well" when called to schedule an appointment. (R. 317).

_____

[18] "[Plaintiff's] joint line shows severe collapse in the lateral aspect as well as severe joint space narrowing. There is significant sclerosis and obvious varus deformity with collapse of the medial compartment." (R. 360)

On September 19, 2003, the MCCMH service progress notes report Plaintiff was drunk; he "admitted to drinking ½ gallon of liquor since yesterday.  Admitted to drinking all along." (R. 317).  He agreed to go into the Harbor Lights detox program and afterwards into grief therapy for the loss of his second wife three years earlier.  Plaintiff went to Harbor Lights with his mother driving him on September 22, 2003, for a five-day program.  (R. 316 - 317).  On September 29, 2003, MCCMH placed a call to Plaintiff, who stated to them that he had a fairly easy detox, "drugged up on Catapress and Librium."  In a follow-up medication review with Dr. Murthi on October 6, 2003, Plaintiff called it "a setback because of not taking his medications regularly."  (R. 312).

In a service review on October 3, 2003, MCCMH reported Plaintiff, since the detox program ending on September 20, 2003, had been taking Antabuse daily, "keeping busy cleaning house, going for bike rides, walking his dog and watching TV."  (R. 313).  He stated he had not been drinking since the program ended, and was on the waitlist for a 30-day Harbor Lights inpatient program.  In the follow-up medication review with Dr. Murthi on October 6, 2003, Dr. Murthy found Plaintiff's "mood stable.  Affect appropriate"; Plaintiff reported "medication compliance now and symptoms are stable."  (R. 312).  On the same day, MCCMH staff spoke with Plaintiff about his attendance at AA, SAMI, or Intensive Outpatient Programs (IOP) for his alcoholism.  (R. 311).

On October 15, 2003, Plaintiff saw James Kehoe, D.O., for his chronic knee pain; Dr. Kehoe noted that Plaintiff had not had much care for his knee, such as arthroscopy, physical therapy, unloader brace or cortizone shots, perhaps because of his health insurance problems. (R. 358).  He recommended conservative therapy in light of Plaintiff's age and prescribed a

cortizone/Lidocaine shot.  On November 5, 2003, Plaintiff saw Dr. Michael Wind, who noted

"mild improvement," and began a series of Synvisc (a joint lubricant) shots, one per week ending

on November 26, 2003.  (R. 355 - 357).

On December 5, 2003, Plaintiff saw Dr. Murthi for another medication review; Plaintiff

reported a "deteriorating" status, i.e., an increase in his depression symptoms, "some ups and

downs in mood and difficulty sleeping."  (R. 309).  At this visit, Dr. Murthi reported Plaintiff's

"grooming and hygiene good" and his mood to be "depressed.  Affect appropriate."  (R. 309).

Dr. Murthi raised Plaintiff's dosage of Zyprexa to 15 mg from 10 mg, and added Lexapro.

Plaintiff saw Dr. Murthi at the MCCMH for a medication review on January 16, 2004.

(R. 381).  According to Dr. Murthi, Plaintiff noted significant improvement with his depression

and mood swings, and was compliant with his medication.  Plaintiff was "stable, improving."

On January 20, 2004, Plaintiff had a service review with MCCMH.  (R. 379).  Plaintiff

denied feeling depressed, stating "the medication is working pretty good. I feel OK as long as I

take my meds."  Plaintiff had some weight gain, and blood tests revealed high blood sugar and

cholesterol.  (R. 379, 381).  He stated he has not been drinking since his stay at Harbor Light on

September 29, 2003, and has had some difficulty getting to AA meetings, etc. due to

transportation problems and the cold weather.  (R. 379).   Plaintiff stated he had signed up for

SAMI meetings starting January 29, 2004.  Plaintiff attended the meeting on this date, (R. 377),

but not on February 5 or February 12, 2004.[19]  (R. 376, 375).

On February 18, 2004, Plaintiff saw Dr. Rob Campbell for a follow-up on his knee

---

[19] - Plaintiff also missed SAMI meetings on February 19 and February 26, 2004, but attended on
March 4 and April 1, 2004.  (R. 372 - 374, 365).

treatment.  (R. 354).  Plaintiff reported some improvement; Dr. Campbell filled out paperwork

for Plaintiff's Disability Application and told him to see him in six months for another Sinvisc

injection.

Plaintiff saw Dr. Murthi on March 11, 2004, for a medication review.  (R. 371).  Dr.

Murthi noted that Plaintiff's grooming and hygiene seemed "good," and his mood and target

symptoms "stable"; Plaintiff was compliant with his medications.  Dr. Murthi recommended

continuing with the same medications, Zyprexa at 15 mg, and Lexapro.

Virginia Rae Mason, RN, at the MCCMH completed an assessment summary the next

day, March 12, 2004.[20]  (R. 368 - 369).  Plaintiff recieved a LOCUS composite score of 20, with

Axis I diagnoses of Bi-Polar Disorder II– Depressed Type and Alcohol Dependence in partial

remission.  (R. 368).  Stressors included Social Environment, Economic, Health Care Access,

and Legal.  His GAF current/highest was 50/40, with a GAF expected at discharge of 65.

On April 2, 2004, Plaintiff saw Wayne Gunkle, D.O., after having a fall the previous

week when his knee gave out.  (R. 353).  An examination showed Plaintiff's knee was

"significantly tender over the lateral aspect of the proximal tibia."  X-rays revealed a non-

displaced lateral tibial plateau fracture, non-depressed and non-angulated.  (R. 352, 353)

Plaintiff seemed to be "ambulating without much difficulty"on the left leg, however.  (R. 353)

Dr. Gunkle gave a prescription for Vicodin and encouraged Plaintiff to wear an IROM brace,

limiting "activity with his knee in ambulation as much as possible."

On April 16, 2004, Plaintiff saw Amjad Yaish, D.O. for a follow-up exam on his knee,

_____

[20] No signature from a supervisor or psychiatrist/psychologist is on the March 12, 2004
assessment summary.  (R. 369).

which was "essentially unchanged" in X-rays.  (R. 351).  Dr. Yaish told Plaintiff to work on his

flexion and extension and prescribed crutches, and left Plaintiff's knee brace open because his

leg would not bear any weight; he also prescribed Tylenol #3, advising Plaintiff that this should

be the last of his narcotic prescriptions.

On April 19, 2004, Plaintiff attended individual therapy as part of his MCCMH program.

(R. 364).  Plaintiff "presented an appropriate mood and affect, den[ying] suicidal/homicidal

ideation."  The session "focused on establishing rapport and obtaining information"; Plaintiff

expressed an interest in focusing on his "unresolved grief issues."

On May 5, 2004, Plaintiff saw Nicholas Schoch, D.O., for a follow-up visit on his knee;

Plaintiff had been doing some cautious weight-bearing on short trips "to the the bathroom and

such," and he was told to stay off the leg completely.  (R. 350).  Dr. Schoch noted Plaintiff had

arrived in the office without crutches.  Plaintiff was told to continue working on his range of

motion and to stay off of his leg.[21]

At a medication review on May 7, 2004, with Dr. Murthi, Plaintiff's grooming and

hygiene were "good," contact with reality "intact" and his mood "energetic."  (R. 363).  Dr.

Murthi concluded that Plaintiff's "target symptoms" were "stable" and that he was "med[ication]

compliant" and "remained abstinent from EtOH."  He recommended that Plaintiff continue the

same treatment.  Plaintiff underwent a individual therapy session the same day, exhibiting an

"appropriate mood and affect." (R. 362).  The session was "based upon [Plaintiff's] unresolved

grief and loss issues."  Plaintiff claimed "he never said goodbye" to his wife following her death;

---

[21] - At a Initial Health Assessment visit to MCCMH on May 7, 2004, clinician noted Plaintiff was
wearing a knee brace.

"he has difficulty expressing feelings due to feeling vulnerable."  (R. 362).

On May 12, 2004, Plaintiff underwent another individual therapy session at MCCMH. (R. 362).  He presented "an appropriate mood and affect, den[ying] suicidal/homicidal ideation." The therapist and Plaintiff continued to work on his "grief and loss issues."

Plaintiff failed to show up for a appointment at MCCMH on May 19, 2004; as with nearly all such events he failed to notify them.  (R. 361).  On May 26, 2004, Plaintiff attended his individual therapy session, which focused on a recent relapse, for which he spent 5 days for detox at the Harbor Light Center.  At the session, Plaintiff attributed this to "boredom."  Plaintiff presented "an appropriate mood and affect, den[ying] suicidal/homicidal ideation."

On June 2, 2004, Plaintiff saw Uzma Rehman, D.O. for a follow-up on his leg.  (R. 349). A concern was that the Plaintiff had been weight-bearing on his leg, despite doctor's instructions, but x-rays revealed "no collapse of the joint line."  On June 9, 2004, Plaintiff called and cancelled his appointment at the MCCMH.  (R. 361).

## IV.   VOCATIONAL EVIDENCE

Vocational Expert ("VE") Elizabeth Posikowski stated that Plaintiff's previous jobs were either unskilled or semi-skilled, with no transferable skills. (R. 407 - 409).  In response to a question from VE Posikowski, Plaintiff stated that it had been more than five years since he had worked as a mechanic (R. 407); she stated that while a mechanic was a "skilled and heavy" job, the length of time that had elapsed since he had done it meant that the skills were not transferable. (R. 408).

When asked to consider the claimant's age, education and his "exertional limitations that he's testified and included in the record, that is he has a limiting ability to sit, stand, lift, carry,

21

push or pull," VE Posikowski stated that the Plaintiff could not do any of his past work.  (R. 409 - 410).  Yet, "in the national and regional economy" there would be "some [unskilled] sedentary and some light jobs" available: sedentary jobs, sorter packer, 3200 jobs, inspector, 3200, and assembly, 3,000; and light jobs including, assembly, 2600, and inspector, 2,000.  She stated that "those would be some of the better jobs."  VE Posikowski noted that the jobs she listed differed from information in the DOT, in that they currently all have "sit/stand options."

ALJ Roshak modified his hypothetical to include Plaintiff's non-exertional limitations, "physical, mental, postural, manipulative, visual, environmental, and functional."  (R. 410).  VE Posikowski testified that "based on the fact that he would miss greater than ten days per year" when Plaintiff would seclude himself, "he would be precluded from all [work].  He wouldn't be able to sustain it."  The plaintiff's attorney declined to cross-examine VE Posikowski.  (R. 411).

## V.    THE ALJ'S DECISION

In a decision on February 14, 2005, ALJ Roshak concluded that the Plaintiff was not under a disability within the meaning of the Social Security Act.  (R. 15 - 25).  ALJ Roshak found that the Plaintiff had alcohol dependancy/abuse; major depressive disorder, recurrent; status post left tibial fracture with post-traumatic arthritis of the left knee; status post lumbar laminectomy; history of third degree burns to the bilateral hands and wrists; and hypertension. (R. 24, 19 - 20).  He found, however, that the Plaintiff's impairments or combination of impairments did not equal one listed in Appendix 1, No. 4, Subpart P of the Regulations.  (R. 24, 20).  ALJ Roshak found Plaintiff's testimony, i.e., his "subjective symptomatology and allegations of debility," to be "somewhat exaggerated, self-serving, and without any objective

22

probative medical or non-medical support." (R. 24, *see* R. 20). ALJ Roshak further found the medical evidence "establishes [Plaintiff] would not be disabled [if] he stopped using alcohol"; he concluded that the Plaintiff would thus be denied benefits under Public Law 104-121 § 105 (1996) prohibits  the award of DIB and SSI to individuals disabled by alcoholism or drug addiction. (*See* 42 U.S.C.A. §§ 423(d)(2)(C), 1382c(a)(3)(J) ). (R. 24, 20).

ALJ Roshak found that the Plaintiff had the functional capacity to perform work related functions, subject to limitations on "prolonged standing/walking" and "lifting/carrying more than 10 pounds" and the requirement of "a sit/stand option for the sake of comfort." (R. 24, 22). ALJ Roshak found Plaintiff unable to perform his past relevant work as a muffler shop manager, mechanic, grinder, janitor or cashier; Plaintiff had "the residual functional capacity to perform unskilled, sedentary work with a sit/stand option." (R. 24, 22). The claimant is a "younger individual," with an "education beyond the high school level." (R. 24, 15). Based on VE Pasikowski's testimony, ALJ Roshak found that Plaintiff did not have any transferable vocational skills to skilled or semi-skilled work. (R. 22, 24).

ALJ Roshak found Plaintiff to have an "exertional capacity for sedentary work," and considering Plaintiff's "age, education, and work experience, found that 20 CFR §§ 404.159, 416.969 as well as Medical-Vocational Rules 201.18–201.21, Table 1, Appendix 2, Subpart P of the Regulations directed a conclusion of "not disabled." (R. 24 - 25, 23). Plaintiff was not able to perform the full range of sedentary work.[22] (R. 24, 22). However, using Medical-Vocational

---

[22]     "Considering the objective evidence and the above-cited activities of daily living, the undersigned finds that Claimant, a younger individual with education beyond the high school level, retains the functional capacity for sedentary work, as defined in 20 CFR 404.1567(a) and 416.967(a), with a sit/stand option for the sake of comfort . . ."
ALJ Roshak's February 15, 2005 Report, R. 22.

Rules 201.18–201.21, Table 1, Appendix 2, Subpart P of the Regulations, as well as VE

Posikowski's testimony and the 11,000 regional jobs she identified, ALJ Roshak found there

were "a significant number of jobs in the national economy he could perform."  (R. 25, 23, 22).

Thus, ALJ Roshak found that the Plaintiff was not under a "disability," as defined in the

Social Security Act, at any time through the date of his decision.  (R. 25, 23; *see* 20 CFR §§

404.1520(f), 416.920(f)).

## VI.  ANALYSIS

### A.  STANDARDS OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is

supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Secretary of Health and*

*Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are

not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v.*

*Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than their

past work, the testimony must be given in response to a hypothetical question that accurately

24

describes Plaintiff in all significant, relevant respects.[23]  A response to a flawed hypothetical

question is not substantial evidence and cannot support a finding that work exists that the

Plaintiff can perform.

Since the 1996 amendments to the Social Security Act, if alcohol or drug abuse

comprises a contributing factor material to the determination of disability, the claimant's

application must be denied. 42 U.S.C. § 423(d)(2)(C); 20 C.F.R § 404.1535.   The regulation

requires the ALJ first to determine whether the claimant is disabled.[24]   20 C.F.R. § 404.1535(a).

---

[23] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)
(hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v.
Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A
vocational expert's responses to hypothetical questions may constitute substantial evidence only if the
questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786,
790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the
claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588,
596 (6th Cir. 1975).

[24] 20 C.F.R. §404.1535 reads (emphasis added):

How we will determine whether your drug addiction or alcoholism is a contributing factor
material to the determination of disability.

(a) ***General. If we find that you are disabled and have medical evidence of your drug
addiction or alcoholism, we must determine whether your drug addiction or
alcoholism is a contributing factor material to the determination of disability.***

(b) *Process we will follow when we have medical evidence of your drug addiction or
alcoholism.*

(1) The key factor we will examine in determining whether drug addiction or
alcoholism is a contributing factor material to the determination of disability is
whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical
and mental limitations, upon which we based our current disability determination,
would remain if you stopped using drugs or alcohol and then determine whether
any or all of your remaining limitations would be disabling.

(i) If we determine that your remaining limitations would not be disabling,
we will find that your drug addiction or alcoholism is a contributing factor
material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are

The ALJ must reach this determination initially using the standard five-step approach described in 20 C.F.R. § 404.1520 "without segregating out any effects that might be due to substance use disorders. *Ball v. Massanari*, 254 F.3d 817, 821 (9th Cir. 2001); *Brueggemann v. Barnhart*, 348 F.3d 689, 694. (8th Cir. 2003). *Brueggemann* notes:

> The determination has to be based on substantial evidence of the claimant's medical limitations "without deductions for the assumed effects of substance use disorders. The inquiry here concerns strictly symptoms, not causes, and the rules for how to weigh evidence of symptoms remain well established. Substance use disorders are simply not among the evidentiary factors our precedents and the regulations identify as probative when an ALJ evaluates a physician's expert opinion in the initial determination of the claimant's disability. *See* 20 C.F.R. § 404.1527." [quoting *Ball,* 254 F.3d at 821]
>
> If the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent. *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir.v2000); 20 C.F.R. § 404.1535(b)(2). We have previously noted that when the claimant is actively abusing alcohol or drugs, this determination will necessarily be hypothetical and therefore more difficult than the same task when the claimant has stopped. *Pettit*, 218 F.3d at 903. Even though the task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other.
>
> Only after the ALJ has made an initial determination 1) that [the claimant] is disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism or drug addiction, may he then reach a conclusion on whether [the claimant's] substance use disorders are a contributing factor material to the determination of disability. If this process proves indeterminate, an award of benefits must follow.

*Id.* at 694 - 695.

### B.   FACTUAL ANALYSIS

---

disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

26

ALJ Roshak determined that the Plaintiff's physical limitations (i.e., his back, hand and knee pain, his mobility restrictions, and his preclusion from certain types of work because of the skin grafts on his hands and forearms) did not limit Plaintiff from all sedentary work. Relying on VE Posikowski's testimony, ALJ Roshak concluded there were approximately 11,000 unskilled, sedentary jobs in the regional economy that Plaintiff could perform. (R. 22). Plaintiff had substantial gainful employment until at least December 1999 with the above physical limitations (R. 70); these limitations had not significantly changed by the time of the hearing. The ALJ's conclusion concerning Plaintiff's exertional residual functional capacity is not challenged by the Plaintiff on appeal. The major focus of the challenge is on the interaction of Plaintiff's alleged mental and substance abuse disabilities on his disability determination.

Plaintiff's first issue on appeal is that the ALJ erred by not affording sufficient weight to the opinions of the consultive and treating psychiatrists, specifically that he ignored GAF scores ranging between 40 and 50, which show a major impairment that would preclude or significantly limit work. Second, Plaintiff's counsel noted that ALJ Roshak did not follow the appropriate procedures for considering whether Plaintiff's alcoholism was a material contributing factor to Plaintiff's disability. Finally, counsel asserts the ALJ erred by finding that Plaintiff's subjective symptoms were "without any probative medical or non-medical support."[25] He asserts the ALJ's negative credibility finding does not comply with SSR 96-7p, which requires specific reasons.

---

[25] Plaintiff's counsel says "objective symptomatology " in his brief, but refers to ALJ Roshak's June 13, 2005 Report, wherein the ALJ evaluated Plaintiff's "subjective symptomatology." (Plaintiff's Motion for Summary Judgment, p. 6, Dkt #6; *see* R. 24)

It is clear that ALJ Roshak's decision does depart from the Commissioner's

regulations in two major fashions. Instead of following the sequence set out in 20 C.F.R.

§404.1535 and detailed in *Brueggemann, Ball,* and other cases[26] and evaluating whether

Plaintiff's physical and psychological impairments were disabling "without deductions

for the assumed effects of substance use disorders"[27] before considering whether

"alcoholism is a contributing factor material," ALJ Roshak  noted:

> Furthermore, Claimant's ongoing alcohol dependency/abuse is a contributing
> factor material to the determination of disability.
> [He then noted that the 1996 Amendments would prohibit an award of
> benefits.]
> * * *
> [After listing and making findings on Plaintiff's mental and physical
> impairments, the ALJ noted Plaintiff] would not be disabled if he stopped
> using alcohol.

(R. 20).

ALJ Roshak's formal findings note:

> The medical evidence establishes that Claimant would not be disabled [if]
> he stopped using alcohol.  Therefore, in accordance with section 105 of Public
> Law 104-121, enacted March 29, 1996, Claimant is ineligible for payments under
> Title II or Title XVI of the Social Security Act.

(Finding #5, R. 24).

These statements of ALJ Roshak suggest he has found Plaintiff to be disabled by his

alcoholism.  Yet ALJ Roshak's formal finding is that Plaintiff can do the various jobs identified

---

[26] *See also Williams v. Barnhart*, 338 F. Supp. 2d 849, 862 (D. Tenn. 2004) (holding that the
ALJ's failure to follow the evaluation process for evaluation of drug addiction was sufficiently
meritorious to support a remand back to the Commissioner: "To find that drug addiction is a contributing
factor material to the determination of disability without first finding the claimant disabled, as the ALJ
did here, is to put the cart before the horse").

[27] *Ball v. Massanari*, 254 F.3d 817, 821 (9th Cir. 2001).

by the vocational expert and is not disabled.  (Finding # 14, R. 25.)   This seems to muddle the order and consistency outlined in § 404.1535 and the cases interpreting it.  The confusion is enhanced – albeit not by ALJ Roshak's doing – by the fact that a major basis for  ALJ Roshak discounting Plaintiff's credibility is his working several jobs after his 1999 disability onset date (R. 21) whereas the Plaintiff's asserted onset date was not changed to late 2001 by his attorney until after ALJ Roshak's decision.[28]

The critical question in this case involves whether Plaintiff is disabled the combination of his exertional limitations and his mental impairments even if he were not drinking.  As noted above, Plaintiff's counsel in this case objects not to the exertional findings but to the finding that Plaintiff is not disabled by his depression and more recently diagnosed bipolar disorder. Plaintiff's treating physicians at MCCMH in March 2003, and May 2003, found a GAF of 40, (R. 342, 331), and the state psychological evaluation of December 2002, found a GAF of only 45. (R. 298).  A GAF of 50 was assessed by MCCMH's Virginia Rae Mason, RN, on March 12, 2004, (R. 368), although she gave a GAF of 40 on March 2003, (R. 343), and her March 2004 report noted Plaintiff's highest GAF in the past year had been 40. (R. 368).  Only the state psychologist consultant, Dr. Briesmeister, found that Plaintiff could work if he remained free of alcohol.  (R.285).

While a low GAF score is not necessarily determinative of a total inability to work,[29] it is

_____

[28]  In a letter to the Appeals Council, Plaintiff amended his onset date of disability to December [19], 2001, one year prior to a psychiatric examination on December 19, 2002 by the state agency consulting examiners Pearson and Wargel who found Plaintiff's highest GAF in the past year was 45.  (R. 387).

[29]  In the Sixth Circuit, courts have ruled that a GAF score need not be mechanistically applied to determine disability.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's

of some significance, and when provided by a treating source it may require some explanation as to why it was not credited or even mentioned by the ALJ, particularly when the assessments by the state consultants are relatively consistent for significant periods of time in 2003.

When evaluating Plaintiff's mental impairments, there are multiple regulations providing guidance.[30] 20 C.F.R. § 404.1520a(e)(1) requires the ALJ to consider activities of daily living;

---

accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate.")  As the definitions of the relevant GAF ranges given above imply, a particular score can embody any of several possible symptoms, which may or may not influence the ability to work. *See*, e.g., *Quaite v. Barnhart*, 312 F. Supp. 2d 1195 (E.D. Mo 2004) (". . . the [GAF] score, standing alone, does not establish an impairment seriously interfering with plaintiff's ability to perform basic work activities. C.f. *Howard.*")

[30] 20 C.F.R.  §404.1545(c) requires consideration of "residual functional capacity for work activity on a regular and continuing basis" and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting."

20 C.F.R.  §404.1545(c) requires consideration of "residual functional capacity for work activity on a regular and continuing basis" and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting."

20 C.F.R. §404.1520a(c)(1) requires consideration of "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment".

Under 20 C.F.R. §404.1520a(c)(2), the decision maker must consider the extent to which the mental impairment interferes with an "ability to function independently, appropriately, effectively, and on a sustained basis" including "such factors as the quality and level of [ ] overall functional performance, any episodic limitations [and] the amount of supervision or assistance [ ] require[d]."

SSR 85-16 notes that the ALJ must take into account:

The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

social functioning; concentration, persistence, or pace; and episodes of decompensation.  Here

Ms. Pearson and Dr. Wargel in their December 2002 report noted that Plaintiff  has difficulty

with both memory and concentration due to pain and depression.[31] (R. 296)

This evaluation under § 404.1520a(e)(1) is generally done in a Psychiatric Review

Technique Form ("PRTF").  Prior to October 2000, the PRTF was completed at the state agency

level and a form was completed by the ALJ and attached to the decision. September 2000

amendments to the regulations modified 20 C.F.R. §404.1520a(e)(2) to no longer require the

ALJ to complete and attach a PRTF; instead, the ALJ in the decision:

> must incorporate the pertinent findings and conclusions based on the technique.
> The decision must show the significant history, including examination and
> laboratory findings, and the functional limitations that were considered in
> reaching a conclusion about the severity of the mental impairment(s). The
> decision must include a specific finding as to the degree of limitation in each of
> the functional areas described in paragraph (c) of this section.

The functional areas are defined in 20 C.F.R. §404.1520a(c) and §416.920a(c) and include daily

living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

Here ALJ Roshak's decision does not follow this protocol for evaluating mental

impairments nor does he include the analysis formerly done in the PRTF.  In addition, in

considering the psychiatric evidence, ALJ Roshak does not seem to consider the record as a

whole, but selective portions.[32]

---

[31] In *Bankston v. Comm'r of Soc. Sec.*, 127 F. Supp. 2d 820 (E.D. Mich. 2000), this court noted that it was reasonable to conclude under the regulations concentration problems occurring "'often' may not be consistent with substantial gainful employment."  *Bankston*, 127 F. Supp. 2d at 826.

[32] The ALJ must also consider the record as a whole. Failure to do so "undermines the Secretary's conclusion." *Hurst v. Secretary of HHS*, 753 F.2d 517, 519 (6th Cir. 1985). This does not require the ALJ to evaluate in writing every piece of evidence but to fairly evaluate the significant evidence.  *See Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) ("Instead, we are interested in knowing that the Secretary has considered and discussed the important evidence, including all medical evidence that is

Several of Plaintiff's psychiatric evaluations are not mentioned in ALJ Roshak's report.[33] In his report, ALJ Roshak summarized the period between "March 2003" and "September 2003" with the phrase "claimant failed to show for multiple therapy sessions..." (R. 18 - 19).  While it is true that Plaintiff, whether because of lack of transportation or lack of motivation, missed multiple therapy sessions, the ALJ does not mention that during this period Plaintiff met on three occasions with Dr. Murthi, on May 22, June 18, and August 13, 2003.  (R. 329 - 331, 328, 320). Dr. Murthi prescribed a different course of medication for patient's "Bipolar disorder II -- depressive type," and a noted a GAF of 40.  (R. 331).  ALJ Roshak also did not address a medication review with Dr. Murthi on December 5, 2003, at which it was noted Plaintiff's condition was "deteriorating." (R. 309)  ALJ Roshak stated Plaintiff "failed to show for a scheduled session in May 2004," which is correct in terms of a missed appointment on May 19, 2004, (R. 361), but neglects to note a May 7, 2004 medication review with Dr. Murthi and an

---

credible, supported by clinical findings and relevant to the question at hand." (citations and internal quotation marks omitted)).

[33]- ALJ Roshak noted in his report the following consultative psychological examinations: the report of James Briesmeister, Ph.D., on December 12, 2001, for Michigan Rehabilitative Services; and the report, for Michigan Disability Determination, of James Wargel, Ph.D and Patricia Pearson, M.A. on December 19, 2002.  (R. 17 - 18; *see* R. 280 - 285 and 295 - 298).

He also noted several psychiatric examinations/diagnoses by Plaintiff's treating physicians in his report. (R. 17 - 19).  In chronological order, ALJ Roshak first noted the diagnoses of G.A. Payton, D.O., Plaintiff's primary care physician, "covering the period April 2000 to December 2001", which would be inclusive of at least two examinations in the record (where Plaintiff's depressive symptoms were diagnosed, Plaintiff prescribed medication and/or his condition monitored) the first, on August 15, 2001, and at least one more on December 21, 2001. (R. 17; *see* R. 271, 288 - 292).  ALJ Roshak also noted an examination with MCCMH on March 18, 2003, (R. 18; *see* R. 331 - 334); three examinations with N.B. Murthi, M.D. on October 6, 2003, January 16, 2004 and March 11, 2004, (R. 18 - 19; *see* R. 312, 381, 371); and one with Virginia Rae Mason, R.N. on March 12, 2004.  (R. 19;  *see* R. 368-369).  ALJ Roshak also noted an examination in "May 2004," following a missed appointment, evidently referring to a individualized therapy session on May 26, 2004 for the MCCMH.  (R. 19, 21; *see* R. 361).

individual therapy session on May 12, 2004.[34]  (R. 363, 362).  Indeed, Dr. Murthi is not even

mentioned in ALJ Roshak's decision.  While there is evidence of improvement by March 2004

afer Plaintiff's mental impairment was diagnosed as bipolar disorder and his medication was

changed, his GAF increase from 40 to 50 still left him in a vocationally problematic range – "A

GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment

in social, occupational, or school functioning (e.g. no friends, unable to keep a job)."[35]   There

was also another set-back in May 2004 , albeit due to another relapse in his drinking.  (R. 361).

        As noted above, the core of this claim relates to the extent Plaintiff's mental impairments

are disabling, and whether his depression and bipolar disorder and their behavioral

manifestations would continue to preclude substantial gainful activity even if Plaintiff were to

cease his drinking, as he has for certain limited periods.  Obviously, the low GAF scores may be

a product of Plaintiff's alcoholism as well as his mental impairments, which is a determination

best sorted out at the administrative level and not by a federal court.

        Plaintiff was given psychiatric diagnoses and GAF ratings that are vocationally

significant by Plaintiff's treating physicians as well as the state psychiatric consultants.  Yet,

little is noted of the MCCMH visits – other than missed appointments, which are important – and

nothing is mentioned of Dr. Murthi and his evaluations.   In addition to providing guidelines and

procedures for evaluating psychiatric impairments and for determining whether alcoholism is a

material contributing factor to a claimant's disability, the Commissioner requires that claimant's

treating physician must be given deference in determining disability, and an ALJ must give

---

        [34] The "failure to show" is in the same sentence noting a "subsequent" individualized therapy session on May 26, 2004, which is noted in two places in the ALJ's report. (R. 19, 21; *see infra*).

        [35] See footnote 15 above.

"good reasons" for discounting a treating physician's opinion. 20 CFR §§ 404.1527(d)(2),

416.927(d)(2); *see*, e.g., *Harris v. Heckler*, 756 F.2d431, 435 (6th Cir. 1985) ("the medical

opinions and diagnoses of treating physicians are generally accorded substantial deference, and

if the opinions are uncontradicted, complete deference").  *Wilson v. Commissioner of Social*

*Security,* 378 F.3d 541, 544-45 (6th Cir. 2004) notes:

> The regulation requires the agency to "give good reasons" for not giving weight to
> a treating physician in the context of a disability determination. 20 C.F.R. §
> 404.1527(d)(2)(2004). This requirement is part of the "treating source" regulation
> adopted by the Social Security Administration in 1991. *See generally Schaal v.*
> *Apfel,* 134 F.3d 496, 503 (2d Cir.1998).
> Pursuant to this regulation, an ALJ must give more weight to opinions
> from  treating sources since
>
>> these sources are likely to be the medical professionals most able to
>> provide a detailed, longitudinal picture of [the claimant's] medical
>> impairment(s) and may bring a unique perspective to the medical evidence
>> that cannot be obtained from the objective medical findings alone or from
>> reports of individual examinations, such as consultative examinations or
>> brief hospitalizations.
> 20 C.F.R. § 404.1527(d)(2)
>
> . . . If the opinion of a treating source is not accorded controlling weight, an ALJ
> must apply certain factors--namely, the length of the treatment relationship and
> the frequency of examination, the nature and extent of the treatment relationship,
> supportability of the opinion, consistency of the opinion with the record as a
> whole, and the specialization of the treating source--in determining what weight
> to give the opinion. *Id.*
> . . .[T]he regulation also contains a clear procedural requirement: "We will
> always give good reasons in our notice of determination or decision for the
> weight we give [the claimant's] treating source's opinion."  *Id.*  A Social Security
> Ruling explains that, pursuant to this provision, a decision denying benefits "must
> contain specific reasons for the weight given to the treating source's medical
> opinion, supported by the evidence in the case record, and must be sufficiently
> specific to make clear to any subsequent reviewers the weight the adjudicator
> gave to the treating source's medical opinion and the reasons for that weight."
> Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996).  "The requirement of
> reason-giving exists, in part, to let claimants understand the disposition of their
> cases," particularly in situations where a claimant knows that his physician has
> deemed him disabled and therefore "might be especially bewildered when told by

an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart,* 362 F.3d 28, 32-33 (2d Cir. 2004).

In making his finding that Plaintiff had "major depressive disorder, recurrent," ALJ Roshak apparently mainly relied on two consultative diagnoses, one by Dr. Briesmeister, from an examination on December 12, 2001, another by Dr. Wargel and Ms. Pearson, on December 19, 2002, and the initial psychological examination at MCCMH on March 18, 2003. (R. 18, 19; *see* R. 280, 295, 331 - 334). ALJ Roshak mischaracterized the Wargel and Pearson diagnosis of "Major Depressive Disorder, recurrent, severe w/o psychotic features," (R. 298), by omitting the term "severe," which demonstrates a greater severity than the "moderate" characterization that Dr. Briesmeister gave. He also makes no mention of why he rejects the diagnosis of MCCMH and Dr. Murthi that Plaintiff did not have a "Major Depressive Disorder," but rather had "Bipolar Disorder II – Depressed Type," requiring a change in medication (R. 331). ALJ Roshak did not give a "good reason" in his decision for rejecting or failing to consider this diagnosis of treating physicians as required by 20 C.F.R. § 404.1527(d)(2) and *Wilson*. Nor are there good reasons not dismissing and not discussing the various low GAF

35

scores in the record.[36]

Thus in various ways, ALJ Roshak's extensive decision in a complicated case fails to follow important procedural guidelines of the Commissioner for evaluating Plaintiff's alleged impairments.

The Sixth Circuit in *Wilson* notes:

It is an elemental principle of administrative law that agencies are bound to follow their own regulations. As the Ninth Circuit well summarized in applying this principle:

'The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates. *See Vitarelli v. Seaton*, 359 U.S. 535, 545, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy*, 347 U.S. 260, 267, 74 S.Ct. 499, 98 L.Ed. 681 (1954). An agency's failure to follow its own regulations "tends to cause unjust discrimination and deny adequate notice" and consequently may result in a violation of an individual's constitutional right to due process. Where a prescribed procedure is intended to protect the interests of a party before the agency, "even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed." *Vitarelli*, 359 U.S. at 547, 79 S.Ct. 968 (Frankfurter, J., concurring); *see also* Note, *Violations by Agencies of Their Own Regulations*, 87 Harv. L.Rev. 629, 630 (1974) (observing that agency violations of regulations promulgated to provide parties with procedural safeguards generally have been invalidated by courts).'

---

[36] ALJ Roshak does give some reasons for discounting the dated state agency reports, but this is insufficient to reject the opinions of treating physicians made after those earlier reports:

Pursuant to 20 CFR 404.1529 and/or 20 CFR 416.929 and SSR 96-6p, the medical source opinions of state agency medical and psychological physicians and other medical opinions have been examined and accorded due consideration with respect to the evidence of record and given appropriate weight in determining Claimant's disability. These opinions and findings may no longer apply as additional evidence has been received subsequent to such assessment or because of testimony received at the hearing which provided information not previously available.

ALJ Roshak's February 14, 2005 Report, (R. 23).

36

> *Sameena, Inc. v. United States Air Force*, 147 F.3d 1148, 1153 (9th Cir.1998)
> (parallel citations and circuit court citations omitted).

*Wilson,* 378 F.3d at 545.

Here the regulations that were not followed are "intended to protect the interests of [the] party

before the agency" and need be followed.

  The Commissioner argues that even if the regulation for determining whether alcohol

was a material contributing factor to Plaintiff's disability was not strictly followed, this technical

mistake was harmless in light of the evidence of record.  Clearly there is much evidence of

Plaintiff's repeated failed efforts to stop drinking.  He has had three significant relapses in the

record after the amended onset date, on or around August 2, 2002, September 19, 2003, and May

12, 2004. (R. 52 - 55; 317; 361).   Plaintiff also has lied about his drinking, and generally has

other problems reflecting adversely on his credibility.   Yet, this regulation was not the only one

not followed.  The PRTF and proper analysis of the opinions of treating sources is also involved.

  *Heston v. Commissioner of Social Sec.,* 245 F.3d 528, 535-36 (6th Cir. 2001) recognized

the concept of harmless error in Social Security reviews.  Yet, *Allen v. Barnhart,* 357 F.3d 1140,

1145 (10th Cir. 2004), urged caution in analyzing whether an error should be considered

harmless:

> [W]e have specifically applied [the principle of harmless error] in social security
> disability cases, though not always by name and without settling on a definitive
> characterization of its precise contours and range of application in this somewhat
> unique, nonadversarial setting. For example, this court has held that certain
> technical errors were "minor enough not to undermine confidence in the
> determination of th[e] case," *Gay v. Sullivan,* 986 F.2d 1336, 1341 n. 3 (10th Cir.
> 1993), *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir.
> 1990), and that an "ALJ's conduct, although improper, d[id] not require reversal"
> because the procedural impropriety involved had not "altered the evidence before
> the ALJ." *Glass v. Shalala,* 43 F.3d 1392, 1396-97 (10th Cir. 1994). For present
> purposes, one significant thing this heterogeneous group of cases has in common

is that in none of them did this court hold an ALJ's failure to make a dispositive finding of fact harmless on the basis that the missing fact was clearly established in the record, which is the only possible basis for invoking the principle in this case.

Two considerations counsel a cautious, if not skeptical, reception to this idea. First, if too liberally embraced, it could obscure the important institutional boundary . . . that courts avoid usurping the administrative tribunal's responsibility to find the facts. Second, to the extent a harmless-error determination rests on legal or evidentiary matters not considered by the ALJ, it risks violating the general rule against post hoc justification of administrative action recognized in *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) and its progeny.

With these caveats, it nevertheless may be appropriate to supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, i.e., where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.

*See also Neal ex rel. Walker v. Barnhart* , 405 F.3d 685, 689 (8th Cir. 2005) ("Harmless error analysis may be appropriate to supply a missing dispositive finding in a social security disability proceeding, where, based on material the ALJ considered, the court can confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.")

It is significant that the Sixth Circuit in *Wilson* remanded to the Commissioner a denial of Social Security benefits because an ALJ's failure to give "good reasons" for rejecting the treating source's opinion, as is required by 20 C.F.R. §404.1527(d)(2),  noting this was appropriate even if substantial evidence otherwise supports the ALJ's decision and even when a different outcome on remand is unlikely:

"[A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway." *Mazaleski v. Treusdell,* 562 F.2d 701, 719 n. 41 [(D.C. Cir 1977)].  To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with [the

38

> regulation], would afford the Commissioner the ability the violate the regulation
> with impunity and render the protections promised therein illusory.

*Wilson,* 378 F.3d at 546.

A court is not to rewrite the administrative decision *post hoc* even where it can find substantial evidence in the record to uphold the decision based on a better crafted analysis and set of findings that it might devise.  Harmless error is to be applied only to a limited group of cases where no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way, not where the court anticipates the final outcome will be unchanged after the remand.  This is not a proper case for this Court to make a finding of harmless error.

## VII.   RECOMMENDATION:

Accordingly, for the above stated reasons IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED IN PART and the record be REMANDED FOR FURTHER ADMINISTRATIVE PROCEEDINGS consistent with this Report.

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);  *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others

39

with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: July 7, 2006                                        s/Steven D. Pepe_____
Ann Arbor, Michigan                                      UNITED STATES MAGISTRATE JUDGE


<u>Certificate of Service</u>


       I hereby certify that a copy of this Order was served upon the attorneys of record by electronic means and or United States Mail on July 7, 2006.

                                                              s/Deadrea Eldridge_____
                                                              Courtroom Deputy Clerk

40